[Cite as *State v. Chambers*, 2014-Ohio-4648.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                  :

    Plaintiff-Appellee,               :

                                                No. 13AP-1093

v.                                             :           (C.P.C. No. 12CR-3834)

James Chambers,                                 :           (REGULAR CALENDAR)

    Defendant-Appellant.              :

D E C I S I O N

Rendered on October 21, 2014

*Ron O'Brien,* Prosecuting Attorney, and *Seth L. Gilbert,* for appellee.

*Meeks & Thomas Co., LPA,* and *David H. Thomas,* for appellant.

APPEAL from the Franklin County Court of Common Pleas

CONNOR, J.

{¶ 1} Defendant-appellant, James Chambers, appeals from a judgment of the Franklin County Court of Common Pleas finding him guilty, pursuant to jury verdict, of one count of felonious assault, a felony of the second degree. Because both sufficient evidence and the manifest weight of the evidence support defendant's conviction, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} On August 2, 2012, the state indicted defendant on one count of felonious assault, in violation of R.C. 2903.11, with a firearm specification, and one count of having a weapon while under disability ("WUD"), in violation of R.C. 2923.13. The events giving rise to the indictment occurred on July 15, 2012.

{¶ 3} On that day the victim, Nekalah, then 13-years-old, left her apartment and went to church with her mother, father, and six siblings. Nekalah and her family lived at 68 North Hampton Street, an apartment building comprised of four apartments. apartments A and B were located on the first floor and apartments C and D were located on the second floor. Nekalah and her family lived in apartment A, Nekalah's grandmother and aunt stayed in apartment B, and defendant resided in apartment C, which was directly above apartment A. After the church service, the family attended a church picnic. Thereafter, Nekalah, her sisters and some of her female cousins returned to apartment A via the church bus. Nekalah's mother and father stayed behind to clean up after the picnic.

{¶ 4} When they arrived home to apartment A, the girls settled down to watch a movie. Nekalah's aunt, Kellie, came over from next door to watch the movie with the girls. Nekalah and Kellie both saw defendant "walk past the window with one of his friends. And we heard them enter the building, go upstairs." (Tr. 174.) Shortly thereafter, as Nekalah sat on the couch, she "thought [she] heard firecrackers." (Tr. 247.) She said it sounded like two firecracker sounds. She then got up from the couch and ran to the back of the apartment "[b]ecause the ceiling was falling." (Tr. 247.) Nekalah began patting herself "[a]nd then [she] saw blood" coming from her left arm. (Tr. 248.) Kellie stated that Nekalah did not scream loudly, but said " 'I got shot' " and started crying. (Tr. 178.)

{¶ 5} Nekalah then ran to her grandmother's door, Kellie was already there banging on the door to apartment B. Nekalah heard people coming down the stairs and she recognized defendant's voice. Nekalah heard defendant say to the man he was with, " 'You already know how I am, bro. You know how I do it.' " (Tr. 254.) Before the men got all the way down the stairs, Nekalah ran outside to the back door of her grandmother's apartment. Kellie noted that defendant was "acting normal" and talking to his friend as he came down the stairs, and that the two men just "went out the door." (Tr. 177.) The bullet did not fully enter Nekalah's arm, but grazed it, causing her to bleed and be in pain. Nekalah stated that she has a scar from where the bullet grazed her arm.

{¶ 6} When the police arrived shortly after the incident, individuals at the scene informed the officers that someone had "shot from upstairs down through the floor." (Tr. 35.) Police noted that as they walked into apartment A "five to ten feet from the top, you saw where there was spackling was falling, and two holes" in the ceiling. (Tr. 37.)

Nekalah's mother testified that those holes were not in her ceiling when she left for church that morning. Spackling was all over the floor and the couch in apartment A. Police recovered two spent bullets from apartment A, one from the couch where Nekalah had been sitting, and one from a picture frame which was hanging on the wall behind the couch. The police eventually made entry into apartment C. No one was there, but officers found three "shell casings on the floor," and noticed the "butt of a gun that was sticking underneath of the cushion of a chair." (Tr. 38.) The gun was an Intra Tec 9mm Luger pistol ("Tec-9"), and it was loaded with live bullets in the magazine. Defendant's DNA was the major donor of DNA on the Tec-9. The police "saw two" bullet holes in the floor of apartment C. (Tr. 39.)

{¶ 7}   The woman who lived in apartment D, Cambria Slokum, explained that she was in her apartment on July 15, 2012, and saw defendant and another man enter the apartment building. Slokum said that the door to defendant's apartment was open, and that as her "door was still cracked open" she saw what "looked like a machine gun" in defendant's apartment. (Tr. 140.) Slokum stated that although she did not see his face, she saw "like the side of the body," and from what she "could see from the side view" she saw defendant shoot the gun. (Tr. 141-42.) Slokum stated that defendant had the gun pointed "[t]owards the floor" when he fired it. (Tr. 142.) After the shooting, Slokum heard defendant "and the other guy they were laughing and walking out of the building." (Tr. 146.) Slokum stated that, once the "screaming took place" downstairs, she saw defendant and the other man "run." (Tr. 147.)

{¶ 8}   Defendant explained that on July 15, 2012, he was out on the street in front of his apartment building playing cards with friends, when his friend Kenny showed up. Defendant explained that "Kenny, he sells items. He always got items for sale; like clothes, shoes, maybe." (Tr. 303-04.) Kenny told defendant he had something to sell him. The men went up to defendant's apartment, and Kenny pulled the Tec-9 firearm out of a bag he had been carrying. Kenny took the gun out of the bag "and handed it to [defendant], [defendant] grabbed it." (Tr. 314.) Defendant looked at the firearm, noticed it was an "automatic weapon" and, defendant stated "I don't want no problems," he determined the firearm was "too much." (Tr. 314.) Defendant then explained that "[a]s [he] handed it back to [Kenny], somehow he dropped it and it goes off." (Tr. 314.) Defendant stated that

"as [he] remember[ed], [the gun] hit the floor, and it went off one time. That's all I remember. It went off one time." (Tr. 314.) However, after sitting through trial, defendant said he believed the gun did go off twice.

{¶ 9} After the gun went off, defendant stated that he "panicked, * * * threw it," and "walked out the house." (Tr. 315-16.) Defendant did not recall hearing any screaming as he walked out of the house. Defendant was across the street on North Hampton when the police arrived, but he did not approach the authorities to inform them that the gun went off accidentally. Defendant heard that he was a suspect in the shooting and, 11 days after the incident, defendant turned himself in to the authorities. Defendant reiterated at trial that "[i]t was a total accident. * * * [Kenny] * * * didn't do it on purpose." (Tr. 318.)

{¶ 10} Defendant elected to have the WUD charge tried to the court, but had the felonious assault charge and firearm specification tried to the jury. The judge found defendant guilty of WUD, and the jury found defendant guilty of felonious assault and the firearm specification. The court sentenced defendant to 4 years of incarceration on the felonious assault charge, with an additional one year of mandatory, consecutive prison time on the firearm specification, and to 24 months of imprisonment on the WUD charge. The court ordered that the sentence on the WUD charge be run concurrently with the felonious assault sentence, for a total prison term of 5 years.

## II. ASSIGNMENTS OF ERROR

{¶ 11} Defendant appeals, assigning the following errors:

> [I.] THE TRIAL COURT ERRED AND THEREBY DEPRIVED APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND COMPARABLE PROVISIONS OF THE OHIO CONSTITUTION BY FINDING APPELLANT GUILTY, AS THE PROSECUTION FAILED TO OFFER SUFFICIENT EVIDENCE TO PROVE BEYOND A REASONABLE DOUBT EACH AND EVERY ELEMENT OF FELONIOUS ASSAULT.
>
> [II.] THE TRIAL COURT ERRED AND THEREBY DEPRIVED APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION BY FINDING APPELLANT GUILTY, AS THE VERDICT FOR THE

CHARGE OF FELONIOUS ASSAULT WAS AGAINST THE
MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 12} Defendant has not appealed his WUD conviction. Accordingly, we confine our analysis to his felonious assault conviction.

{¶ 13} Whether evidence is legally sufficient to sustain a verdict is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Sufficiency is a test of adequacy. *Id.* The evidence is construed in the light most favorable to the prosecution to determine whether a rational trier of fact could have found the essential elements of the offense proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus; *State v. Conley*, 10th Dist. No. 93AP387 (Dec. 16, 1993). When reviewing the sufficiency of the evidence the court does not weigh the credibility of the witnesses. *State v. Yarbrough,* 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 79.

{¶ 14} Sufficiency of the evidence and manifest weight of the evidence are distinct concepts; they are "quantitatively and qualitatively different." *Thompkins* at 386. When presented with a manifest weight argument, we engage in a limited weighing of evidence to determine whether sufficient competent, credible evidence permits reasonable minds to find guilt beyond a reasonable doubt. *Conley,* supra. *Thompkins* at 387 (noting that "[w]hen a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony"). In the manifest weight analysis the appellate court considers the credibility of the witnesses and determines whether the jury "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1983). Determinations of credibility and weight of the testimony remain within the province of the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. The jury may take note of any inconsistencies and resolve them accordingly, "believ[ing] all, part or none of a witness's testimony." *State v. Raver,* 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶ 21, citing *State v. Antill*, 176 Ohio St. 61, 67 (1964).

{¶ 15} R.C. 2903.11 defines felonious assault, in relevant part, as knowingly causing or attempting to cause physical harm to another by a means of a deadly weapon.

A person acts knowingly, regardless of his purpose, when "he is aware that his conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). "[T]he shooting of a gun in a place where there is a risk of injury to one or more persons supports the inference that appellant acted knowingly," regardless of his purpose. *State v. Gregory*, 90 Ohio App.3d 124, 131 (12th Dist.1993). *See also State v. Foster*, 10th Dist. No. 08AP-523, 2008-Ohio-3525, ¶ 13 (noting that "firing a gun through a door behind which persons are known to be standing could satisfy the 'knowingly' mens rea for felonious assault"); *State v. Lee*, 10th Dist. No. 97APA12-1629 (Sept. 3, 1998) (noting that "[f]iring into the dwelling place of another supports an inference that an assailant acted knowingly").

{¶ 16} The record evidence demonstrated that defendant entered his apartment on July 15, 2012 with his friend Kenny. Kenny took the Tec-9 firearm out of the bag and defendant grabbed the gun. Slokum, watching from across the hall, testified that she saw defendant fire the gun as he had it pointed down "[t]owards the floor." (Tr. 142.) Slokum affirmed that it was defendant who she saw fire the gun. Shortly after she saw defendant go upstairs, Nekalah heard "firecrackers," the ceiling was falling down on her, and she said to her aunt " 'I got shot.' " (Tr. 247, 178.) The police observed two bullet holes in the floor of apartment C, and two bullet holes in the ceiling of apartment A. They recovered one spent bullet from the couch were Nekalah had been sitting, and found another lodged in a picture frame behind the couch. Defendant knew that a large family occupied the apartment below him, as he indicated his belief that there were "15 people in that house. They laughing, the baby's crying * * *. There's a lot of activity downstairs." (Tr. 322.)

{¶ 17} Construing the evidence in favor of the prosecution, we find there was sufficient evidence to allow the jury to infer that defendant acted knowingly to cause physical harm to another by means of a deadly weapon when he fired the Tec-9 firearm down towards the floor of his second floor apartment, thereby causing physical harm to Nekalah. Defendant asserts that sufficient evidence does not exist to support his conviction because Slokum lacked credibility and because the police officers did not thoroughly investigate the scene. Regardless of what extra steps the police could have taken to investigate the scene, the record evidence sufficiently supports the elements of felonious assault. Additionally, in a sufficiency analysis we do not consider the credibility

of witnesses or "whether the evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Smith*, 10th Dist. No. 08AP-736, 2009-Ohio-2166, ¶ 26.

{¶ 18} Defendant asserts under his second assignment of error that his convictions are against the manifest weight of the evidence. He notes that he has "consistently claimed that this was an accidental discharge of a firearm owned by a man named Kenny." (Appellant's brief, 13.) *See State v. Vance*, 5th Dist. No. 2007-COA-035, 2008-Ohio-4763, ¶ 98, citing *State v. Bayes*, 2d Dist. No. 00CA0032 (Dec. 29, 2000) (explaining that "[a]ccident" is not an affirmative defense, but "a factual defense that denies that the accused acted with the degree of culpability or mens rea required for the offense"). Although defendant's version of events was that the gun accidentally discharged when he handed the gun back to Kenny, the jury was under no obligation to accept defendant's testimony as truthful. *See State v. Carter*, 72 Ohio St.3d 545, 554 (1995).

{¶ 19} Slokum testified that she saw defendant shoot the gun down towards the floor of his apartment. Defendant asserts that Slokum lacked credibility, as she testified that she heard five gunshots, she originally provided police with a fake last name, and she admitted that she did not see the face of the shooter. Slokum explained that she provided investigators with a fake name, "[b]ecause at that time [she] had a warrant." (Tr. 149.) Additionally, Slokum admitted that she did not see defendant's face when he shot the gun, as she only saw "the side of the body." (Tr. 141.) Although defendant asserts that this is problematic, as both he and Kenny were black males of a similar build, Slokum testified that "[t]he other guy that was with [defendant] was thinner than him and taller." (Tr. 157.) The jury was entitled to believe all or only part of Slokum's testimony. *Raver* at ¶ 21. The jury heard Slokum testify, and was in the best position to judge her credibility. We cannot say that the jury clearly lost its way in believing Slokum's testimony that defendant fired the Tec-9 firearm on July 15, 2012.

{¶ 20} Defendant also asserts that the "investigators had difficulty in linking" the Tec-9 recovered from defendant's apartment to "the spent shell casings in the apartment and the bullets recovered downstairs." (Appellant's brief, 13-14.) The firearm expert, Mark Hardy, however, definitively stated that, of the three shell casings found in apartment C, these casings "were, in fact, fired by this particular weapon." (Tr. 209.) Because the spent

projectiles recovered from apartment A lacked sufficient individual characteristics to support a comparison, Hardy was unable to determine whether those spent projectiles were fired from the Tec-9, although he noted that he could not "eliminate that possibility either." (Tr. 210.) As defendant admitted that the gun went off in his apartment that day, and Nekalah testified that the bullets came down through the ceiling during the time that defendant was in his apartment, the inability of the forensic examiners to link the spent projectiles to the firearm does not render defendant's conviction against the manifest weight of the evidence.

{¶ 21} Defendant further notes that "[a]lthough shell casings were found in the second floor apartment, when those rounds were fired could not be determined." (Appellant's brief, 14.) However, by defendant's own testimony, Kenny brought the Tec-9 firearm into his apartment for the first time on July 15, 2012, and the forensic evidence demonstrated that the shell casings were fired from the Tec-9. There was no evidence indicating that Kenny brought additional shell casings into defendant's apartment and dropped them on the floor.

{¶ 22} Defendant additionally notes that, although the state alleged that he "intentionally fired the weapon and that an accidental discharge could not occur with the gun which was seized, Mr. Hardy could not discount the possibility that an accidental discharge occurred." (Appellant's brief, 14.) Hardy explained that, in order to fire this particular weapon, the shooter would have to pull back on the bolt handle "and allow it to slide forward," thereby bringing "the bolt back" and allowing the bullet to move into the chamber. (Tr. 206.) After pulling the bolt back, one would shoot the gun by pulling down on the trigger. Hardy noted that the gun had a "trigger guard" to "prevent unintentional contact with the trigger," and noted that there was no damage to the trigger guard. (Tr. 207-08.)

{¶ 23} Hardy explained that he tried to make the gun accidentally discharge by dropping it on the floor. He stated that he "attempted three times at a muzzle-to-floor distance of two feet, and again three times at a muzzle-to-floor distance of four feet," and could not get the gun to discharge accidentally. (Tr. 223-24.) Hardy also stated that he could not exclude the possibility of an accidental discharge. The jury heard all of the evidence regarding how to fire the gun, defendant's claim that the gun discharged

accidentally twice, Slokum's testimony that she saw defendant fire the gun, and Hardy's testimony regarding his attempts to make the gun discharge accidentally by dropping it. In light of such evidence, we cannot say that the jury lost its way by not believing defendant's claim that the gun discharged accidentally.

{¶ 24} Defendant further contends that when his DNA was deposited on the Tec-9 it "[could not] be determined by experts." (Appellant's brief, 14-15.) However, as defendant admitted that he handled the Tec-9 firearm on the day of the incident, when his DNA was deposited on that firearm, is immaterial. Defendant also asserts that "[n]o photographs were taken to document the placement of the bullet holes in the second floor apartment." (Appellant's brief, 15.) However, both Police Officer Andrew Hawkins and Detective Heather Collins testified that they saw two bullet holes in the floor of apartment C. Detective Collins noted that she "personally verif[ied] the holes" in the floor of apartment C as she attempted to run rods through the holes. (Tr. 109.)

{¶ 25} Defendant also contends that it was "egregious" that the officers "were not able to extrapolate from the rods the approximate angle and location from which the bullet was fired" and that "investigating officers never attempted to extrapolate an angle of fire from the bullet strike to the hole." (Appellant's brief, 15.) Detective Collins explained that the officers did not try to determine the angle of fire because they "would have had to torn [sic] the ceiling out and didn't really feel it was necessary." (Tr. 110.) As Detective Collins explained: "I mean, there's a hole in the floor. There's a hole in the ceiling downstairs. So I wasn't going to rip out the floor and the ceiling of two apartments to do that." (Tr. 110.) Such conduct by the investigating officers hardly appears egregious, especially as defendant admitted that the gun went off in his apartment on July 15, 2012.

{¶ 26} Lastly, defendant asserts that the "second man from the apartment, identified by two eyewitnesses, was never pursued nor found." (Appellant's brief, 15.) However, defendant never gave the police any way to locate Kenny, as he could not provide them with Kenny's last name or address. Defendant noted that even he could not "get in contact with Kenny" as Kenny "just pops up when he wants to." (Tr. 326.)

{¶ 27} This is not the exceptional case where the evidence weighs heavily against the conviction. Although, under a manifest weight of the evidence analysis, we are able to consider the credibility of the witnesses, "in conducting our review, we are guided by the

presumption that the jury, * * * is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *State v. Tatum*, 10th Dist. No. 10AP-626, 2011-Ohio-907, ¶ 5, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). Engaging in the limited weighing of the evidence which we are permitted, we cannot say the jury clearly lost its way when it found defendant guilty of felonious assault and the attendant firearm specification beyond a reasonable doubt. Accordingly, we find that the manifest weight of the evidence supports defendant's conviction.

{¶ 28} Based on the foregoing, defendant's first and second assignments of error are overruled. Having overruled defendant's assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

SADLER, P.J. and TYACK, J., concur.

————————————