[Cite as *State v. Richey*, 2018-Ohio-3498.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 17AP-260 |
| v. | : | (C.P.C. No. 15CR-4107) |
| Latrell D. Richey, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on August 30, 2018

**On brief:** *Ron O'Brien,* Prosecuting Attorney, and *Barbara A. Farnbacher,* for appellee.

**On brief:** *Brian J. Rigg,* for appellant.

APPEAL from the Franklin County Court of Common Pleas

DORRIAN, J.

{¶ 1} Defendant-appellant, Latrell D. Richey, appeals the March 20, 2017 judgment of the Franklin County Court of Common Pleas, convicting him, pursuant to a jury verdict, and imposing sentence. For the following reasons, we affirm.

I. Facts and Procedural History

{¶ 2} This matter arises out of the July 30, 2015 fatal shooting of James Flannery, a delivery driver for Papa John's Pizza ("Papa John's"). On August 21, 2015, a Franklin County Grand Jury filed an indictment charging appellant with nine criminal counts: (1) kidnapping, in violation of R.C. 2905.01, a felony of the first degree; (2) aggravated robbery, in violation of R.C. 2911.01, a felony of the first degree; (3) aggravated murder, in violation of R.C. 2903.01, an unclassified felony; (4) and (5) murder, in violation of R.C. 2903.02, both unclassified felonies; (6) and (7) two counts of intimidation of an attorney, victim, or witness in a criminal case, in violation of R.C. 2921.04, both felonies of the third

degree; and (8) and (9) two counts of having weapons while under disability, in violation of R.C. 2923.13, both felonies of the third degree. All counts, with the exception of the charges for having weapons while under disability, contained a three-year firearm specification pursuant to R.C. 2941.145(A).

{¶ 3} On January 27, 2017, appellant filed a notice of alibi. On January 30, 2017, appellant filed a waiver of his right to a jury trial on a count of having weapons while under disability. On January 30, 2017, the matter proceeded to trial by jury on the remaining counts.

{¶ 4} Michelle Reynolds-Parra, a patrol officer with the Columbus Division of Police, testified that shortly after 11 p.m. on July 30, 2015, she responded to a report of a shooting in the area of Kimberly Parkway and Hamilton Road in Columbus. Upon arriving, Officer Reynolds-Parra observed a lighter-colored minivan, which she later observed was a delivery van for Papa John's, had struck a pole. Another officer who was already present at the scene was assisting a person, later identified as Flannery, who was suffering from a chest wound.

{¶ 5} Robert B. Polta, an officer with the Community Response Team ("CRT") of the Columbus Division of Police, testified that at approximately 11 p.m. on the date of the incident he and two other members of CRT responded to a report of a shooting at a house located near the intersection of Kenaston Drive and Weyburn Road in Columbus ("vacant house"). The house was vacant and secure. Another officer who arrived at the scene with Officer Polta found a real estate sign on the west side of the house, part of which was missing and later located in the front yard. In the street around the vacant house, Officer Polta found a shell casing that had been crushed. Another officer who arrived at the scene found drops of blood a few feet away from the shell casing. The officers spoke to a witness who reported hearing a single gunshot and observing individuals run northbound through the backyard of the vacant house.

{¶ 6} David Ramey, a detective with the Crime Scene Search Unit ("CSSU") of the Columbus Division of Police, arrived at the vacant house at approximately 1 a.m. on July 31, 2015. Detective Ramey and two other CSSU detectives processed the scene at the vacant house, then processed the scene at Kimberly Parkway and Hamilton Road. The detectives returned to the vacant house later in the morning to ensure nothing was missed. Detective

Ramey identified photographs he took at the scenes, which were later admitted into evidence, a diagram of the scene at the vacant house, and the shell casing recovered by Officer Polta.

{¶ 7} Larry Shoaf, a CSSU detective with the Columbus Division of Police, testified that on July 31, 2015 he responded to a request to process evidence found at a house on Meridian Court in Columbus. Detective Shoaf photographed and retrieved a Papa John's delivery bag in the bottom of a trash can outside the Meridian residence. There was no other debris or trash in the trash can where the delivery bag was found.

{¶ 8} Raymond Guman, a CSSU detective with the Columbus Division of Police, testified that in August 2015 he searched Flannery's minivan which was recovered from the scene at Kimberly Parkway and Hamilton Road. Detective Guman recovered a delivery ticket from a black money bag that was located between the front seats of the vehicle. The ticket contained a name, John Smith, a phone number ending in 9928, and an address that matched that of the vacant house. Detective Guman photographed the location of a possible bullet strike on the driver's side door and possible blood on the interior of the driver's side door.

{¶ 9} Lisa Swisher, a CSSU detective with the Columbus Division of Police, testified that on August 20, 2015 she collected evidence from a house on Rotunda Court ("Rotunda house") in Columbus. Specifically, Detective Swisher collected two Papa John's Pizza boxes, a two-liter bottle of Sierra Mist, and a piece of pizza. Detective Swisher found a label on each pizza box with the same name, phone number, and address as the delivery ticket recovered from the minivan.

{¶ 10} Jacqueline Mitchell, a CSSU detective with the Columbus Division of Police, testified that on August 21, 2015 she collected three wet hooded sweatshirts from a wooded location near Rotunda Court.

{¶ 11} J.H., who was 15 years old at the time of trial, testified that on July 30, 2015, when he was 13-years old, he was approached by Sir Jeffrey Carroll, who asked J.H. if he wanted to make some money. J.H. agreed and followed Carroll to the vacant house, where they met appellant. J.H., at appellant's instructions, removed a realtor's sign from the front of the house and placed it on the side of the house. Carroll, using a telephone application or "calling app" on his cell phone that provided a different phone number from his own,

called Papa John's and ordered two pizzas and a bottle of soda. (Tr. Vol. I at 163.) At that point, J.H. understood that "[t]hey [were] going to take the money and the pizza and the pop from the pizza man." (Tr. Vol. I at 128.)

{¶ 12} J.H. waited in the yard behind the vacant house with Carroll and appellant. Appellant showed J.H. a gun he had in his pocket. J.H. described the gun as small and red with a black handle. While they waited for the delivery, J.H. left and returned with three hooded sweatshirts for himself, Carroll, and appellant.

{¶ 13} Flannery arrived and parked his vehicle on the opposite side of the street from the vacant house. When Flannery rang the doorbell, J.H. ran around the house with Carroll and appellant, who pointed his gun at Flannery and told him to step off the porch. Flannery stood completely still for about 25 to 30 seconds, then stepped off the porch, began walking slowly backwards toward his vehicle, and threw his delivery bag at J.H. and his companions. Appellant shot Flannery, who threw money from his pocket onto the ground where it was retrieved by either Carroll or appellant. J.H. took the pizza which was in a delivery bag and one of his companions took the soda. J.H. and his companions then fled the scene.

{¶ 14} As J.H. and his companions fled, appellant told them to remove their hooded sweatshirts and throw them into bushes, which they all did. Carroll took the delivery bag from J.H. and removed the pizza boxes. They fled to the Rotunda house where appellant was staying, went to the basement, and ate the pizza. J.H. saw appellant drink some of the soda without touching his lips to the bottle. J.H. testified Carroll then left to buy marijuana. Appellant removed the gun from his pocket, pointed it toward J.H., and told J.H. not to tell anyone what happened.

{¶ 15} Later, J.H. was contacted by police and asked to come to a police station. J.H. went with his mother. At first, J.H. denied involvement, but later admitted he saw appellant shoot the delivery driver.

{¶ 16} At trial, J.H. indicated on a diagram where the shooting occurred and the Rotunda house at which appellant was staying. J.H. testified he entered into an agreement, which was admitted into evidence, with plaintiff-appellee, State of Ohio, to testify in exchange for a reduction in his charge from murder to manslaughter.

{¶ 17} Carroll testified he had known J.H. for approximately five years. On the date of the incident, Carroll was staying with appellant at the Rotunda house when they decided to rob a pizza delivery driver. J.H. asked to accompany them and appellant agreed. The three companions met at the vacant house.

{¶ 18} According to Carroll, appellant told J.H. to move the realtor sign from the front of the vacant house. Carroll testified a friend of J.H. brought them three hooded sweatshirts to wear in order to conceal their faces. Carroll used a telephone application he identified as a "Pinger app" in order to disguise his actual telephone number when he called for pizza delivery. (Tr. Vol. II at 366.) Carroll ordered two pizzas and Sierra Mist soda.

{¶ 19} When Flannery arrived, Carroll and his companions ran from the backyard to the front yard of the vacant house. Appellant stated to Flannery, "You know what time it is," which Carroll stated meant this was a robbery. (Tr. Vol. II at 370-71.) Carroll told Flannery to go to the backyard. Instead, Flannery walked off the porch, threw the pizza and soda, and ran toward his vehicle. As Flannery tried to get in his vehicle, Carroll kicked the door and appellant stated, "Watch out, Cuz. I'm about to shoot him." (Tr. Vol. II at 372.) Carroll moved and heard a bang. He grabbed the money while J.H. grabbed the pizzas and then ran with appellant and J.H. through the vacant house's backyard and jumped over the fence. On the way, they all took off their hooded sweatshirts and threw them in bushes along with the delivery bag.

{¶ 20} Carroll and his companions went back to the basement of the Rotunda house where they ate the pizza and drank the soda. Carroll then left to get some marijuana using the money they took from Flannery. After Carroll left the Rotunda house, he noticed the delivery bag was still visible in the bushes so he removed the delivery bag and disposed of it in a nearby trash can.

{¶ 21} Approximately ten days later, Carroll was visiting his cousin at a hospital when he was confronted by police and arrested. In his possession was the phone he used to arrange the delivery. When initially interviewed by police, Carroll denied involvement, saying he was on the north side of Columbus on the day of the incident.

{¶ 22} At trial, Carroll identified the hooded sweatshirts he and his companions wore that night. Carroll testified that, prior to the incident, he had seen appellant with a gun that was red with a black handle. Carroll did not realize appellant had a gun on the

night of the incident until he heard the shot. Carroll stated they had planned to beat up the delivery driver, not shoot him.

{¶ 23} Carroll testified that, pursuant to a plea agreement with the state, he entered a guilty plea to involuntary manslaughter, aggravated robbery, carrying a concealed weapon, and a firearm specification. In exchange for his truthful testimony, the state agreed to recommend a sentence of 9 years and 11 months incarceration.

{¶ 24} Miguel Sanchez testified that, at the time of the incident, he lived across from a vacant house that was for sale on Kenaston Drive. On July 30, 2015, Sanchez noticed the sale sign was missing from the Kenaston house's yard. That night, Sanchez heard a single gunshot. When he looked out the window of his house, he observed two individuals standing on either side of a pizza delivery vehicle. The vehicle drove away and the individuals who were around the vehicle ran off along with a third person toward the rear of the Kenaston house. Afterward, Sanchez saw two individuals search the street and bushes, removing a delivery bag from the bushes before they departed.

{¶ 25} Dr. Donald Pojman, a deputy coroner at the Franklin County Coroner's Office, testified he performed an autopsy on Flannery. According to Dr. Pojman, Flannery suffered a single bullet wound which resulted in his death. The bullet entered Flannery's back below his right shoulder blade, struck his lung and heart, and then exited through the front of his body.

{¶ 26} Lawrence Gauthney, a detective with the Criminal Intelligence Unit of the Columbus Division of Police, testified that on August 11, 2015 he arrested Carroll at Grant Hospital, whereupon he seized his cell phone. Detective Gauthney provided Carroll's cell phone to James Howe, a homicide detective with the Columbus Division of Police. On August 15, 2015, Detective Gauthney went to Rotunda Court to locate another suspect, but was unable to locate him due to an incorrect address. While he was in the area, he made contact with Latonya Nichols, a resident of another house on Rotunda Court. After obtaining Latonya Nichols' consent to search her residence, Detective Gauthney discovered appellant inside the residence and arrested him.

{¶ 27} Detective Howe, who testified as an expert in digital forensics, stated he received Carroll's cell phone from Detective Gauthney. Detective Howe determined, based on telephone records from Papa John's, that a telephone application called "Pinger" was

used to place the July 30, 2015 order. (Tr. Vol. III at 497.)  Upon examining Carroll's cell phone and associated records, Detective Howe was able to determine Carroll's cell phone was used to make the call to Papa John's through the Pinger application.  Detective Howe also determined the Pinger application had been installed on Carroll's cell phone on July 30, 2015.  Conducting an analysis of data from cellular towers, Detective Howe determined, with a reasonable degree of scientific certainty, that Carroll's cell phone was in the area of the vacant house when the call was made to Papa John's using the Pinger application.

{¶ 28} Kelly Callahan, an area supervisor for Papa John's, testified for the state. Callahan identified the delivery ticket that Detective Guman recovered from the vehicle. According to Callahan, the delivery ticket reflected that Flannery received the ticket on July 30, 2015 at 10:09 p.m. for an order that was placed at 9:50 p.m. by a customer named John Smith, who had a phone number ending in 9928, and had the same address as the vacant house.  The order contained two large pepperoni pizzas and two bottles of Sierra Mist.  Callahan identified a label on the pizza box that was recovered from the Rotunda house as matching the information on the delivery ticket.  Callahan also identified the delivery bag that was recovered by Detective Shoaf as one used by delivery drivers for Papa John's.  Callahan testified it would take a delivery driver approximately seven to eight minutes to reach the vacant house from the Papa John's location where Flannery worked.

{¶ 29} Jennifer Gribi, a homicide detective with the Columbus Division of Police, testified that fingerprinting analysis was performed on the signs recovered from the vacant house and the two pizza boxes found in appellant's residence on Rotunda Court. DNA analysis was performed on the hooded sweatshirts recovered by Detective Mitchell as well as the Sierra Mist bottle and piece of pizza recovered from appellant's residence.  No usable results were obtained from the fingerprinting or DNA analysis, with the exception of the Sierra Mist bottle.

{¶ 30} At trial, the parties entered a stipulation that, if called to testify, Jessica Damin, a forensic scientist with the Columbus Division of Police Crime Laboratory, would testify that "[a] DNA profile from the Sierra Mist soda bottle is consistent with the DNA

profile of [appellant].  To a reasonable degree of scientific certainty [appellant] is the source of this profile." (Tr. Vol. IV at 734.)[1]

{¶ 31} Appellant presented alibi testimony from two witnesses. Latonya Nichols testified that, beginning in June 2015, appellant lived in the basement of her residence on Rotunda Court.  She stated appellant was at her residence on July 30, 2015 when she went to bed.  She testified she was very close to appellant who was "like my son." (Tr. Vol. III at 578.)

{¶ 32} Brian Nichols, Latonya Nichols' son who also lived at her residence, testified that appellant and appellant's girlfriend were at the residence on the night of July 30, 2015.

{¶ 33} On February 8, 2017, the jury returned a verdict of guilty on all counts and specifications except the counts of intimidation of an attorney, victim, or witness in a criminal case and related specifications.  On February 8, 2017, the trial court filed an entry reflecting that, following a bench trial on the same day, it found appellant guilty of the count of having weapons while under disability.

{¶ 34} On March 20, 2017, the trial court filed a judgment entry reflecting appellant's convictions and imposing the following sentence: 6 years on the count of kidnapping, 6 years on the count of aggravated robbery, 30 years to life on the count of aggravated murder, 3 years on the count of having weapons while under disability, and 3 years on the firearm specifications. The court ordered all counts were to be served concurrently for a total period of incarceration of 33 years to life.

## II.  Assignments of Error

{¶ 35} Appellant appeals and assigns the following three assignments of error for our review:

> [I.] THE TRIAL COURT ERRED WHEN IT DENIED DEFENDANT-APPELLANT'S CRIMINAL RULE 29 MOTION FOR ACQUITTAL.
>
> [II.] THE VERDICTS OF GUILTY TO KIDNAPPING, AGGRAVATED ROBBERY, AGGRAVATED MURDER AND MURDER ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

---

[1] "The DNA profile from the Sierra Mist soda bottle is consistent with the DNA profile of [appellant]. To a reasonable degree of scientific certainty, [appellant] is the source of this profile." (Pltf.'s Ex. W.)

[III.] THE TRIAL COURT ERRED WHEN IT ALLOWED THE STATE TO ARGUE THE TIMING OF DEFENDANT-APPELLANT'S NOTICE OF ALIBI IN CLOSING ARGUMENT.

## III. First Assignment of Error—Motion for Acquittal

{¶ 36} In his first assignment of error, appellant asserts the trial court erred in denying his motion for acquittal under Crim.R. 29.

{¶ 37} A motion for acquittal under Crim.R. 29 attacks the sufficiency of the evidence. *State v. Watkins*, 10th Dist. No. 14AP-807, 2016-Ohio-1029, ¶ 17, citing *State v. Lytle*, 10th Dist. No. 13AP-866, 2015-Ohio-1133, ¶ 26; *State v. Elqatto*, 10th Dist. No. 11AP-914, 2012-Ohio-4303, ¶ 10. Therefore, in reviewing whether the trial court erred in denying a motion for acquittal under Crim.R. 29, we apply the same standard used to review a challenge to the sufficiency of the evidence. *State v. Kearns*, 10th Dist. No. 15AP-244, 2016-Ohio-5941, ¶ 44; *Watkins* at ¶ 17.

{¶ 38} Sufficiency of the evidence is a legal standard that tests whether the evidence is adequate to sustain a verdict as a matter of law. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 11; *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). In reviewing a challenge to the sufficiency of the evidence, an appellate court must determine "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. Where the evidence, "if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt," it is sufficient to sustain a conviction. *Id.* "The testimony of a single witness, if believed by the finder of fact, is sufficient to support a criminal conviction." *State v. Booker*, 10th Dist. No. 15AP-42, 2015-Ohio-5118, ¶ 18, citing *Elqatto* at ¶ 20.

### A. Firearm Specifications

{¶ 39} With regard to the firearm specifications attached to each charge except for the charge of having weapons while under disability, appellant argues the state did not present sufficient evidence to support the specifications because "the police did not find a firearm on [appellant] or anywhere in the house where he was living [and] [n]o gun was admitted into evidence." (Appellant's Brief at 12-13.)

{¶ 40} R.C. 2941.145 governs firearm specifications and provides for a mandatory three-year prison term if the offender displayed, brandished, indicated possession of or used the firearm while committing the offense in question. We have previously stated that "where the alleged gun is not recovered, possession of a firearm, and consequently an associated firearm specification or charge of possession of a weapon while under disability, may be proven beyond a reasonable doubt by circumstantial evidence." *State v. Carson*, 10th Dist. No. 98AP-784 (Apr. 22, 1999), citing *State v. Thompkins*, 78 Ohio St.3d 380, 385 (1997). *See generally State v. Peters,* 10th Dist. No. 13AP-748, 2014-Ohio-1071, ¶ 12. Such evidence may "consist of eyewitness testimony of individuals who observed the alleged weapon and the circumstances in which it was used. *Carson*, citing *State v. Murphy*, 49 Ohio St.3d 206 (1990). Here, J.H. testified appellant pointed his gun at and shot Flannery. Carroll testified appellant stated he was "about to shoot" Flannery; immediately after, Carroll heard a bang. (Tr. Vol. II at 372.) Based on this testimony, there was sufficient evidence to support the firearm specifications.

## B. Other Convictions

{¶ 41} Appellant contends the evidence presented at trial was insufficient to convict him of kidnapping, aggravated robbery, aggravated murder, murder, and having weapons while under disability. With the exception of the firearm specifications, as previously discussed, appellant does not provide separate arguments, with citation to either the record or caselaw, in support of his contention that his convictions were not supported by sufficient evidence. Instead, appellant makes a consolidated argument challenging the witnesses' credibility. Specifically, appellant argues there were no independent eyewitnesses who identified him as the shooter, there was no physical evidence at the crime scene tying him to the incident, and "[t]he only evidence that links [appellant] to these crimes is the testimony of his alleged co-defendants, who each got significant deals from the state by testifying." (Appellant's Brief at 7.)

{¶ 42} Thus, although appellant frames his assignment of error in terms of sufficiency of the evidence, appellant's contentions actually address the manifest weight of the evidence. *State v. Tucker*, 10th Dist. No. 15AP-434, 2016-Ohio-1033, ¶ 14, citing *State v. Reed*, 10th Dist. No. 08AP-20, 2008-Ohio-6082, ¶ 48; *State v. Williams*, 10th Dist. No. 14AP-546, 2015-Ohio-1136, ¶ 27, citing *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-

2126, ¶ 79-80 (noting that when examining sufficiency of the evidence, appellate courts "do not assess whether the prosecution's evidence is to be believed, but whether, if believed, the evidence supports the conviction"); *State v. Chambers*, 10th Dist. No. 13AP-1093, 2014-Ohio-4648, ¶ 17. Therefore, appellant's arguments regarding the credibility of the witnesses are more appropriately considered in our analysis of his second assignment of error. Nevertheless, we examine whether appellant's convictions for kidnapping, aggravated robbery, aggravated murder, murder, and having weapons while under disability were supported by sufficient evidence.

1. Kidnapping

{¶ 43} Pursuant to R.C. 2905.01, a person is guilty of kidnapping if the person "by force, threat, or deception * * * remove[d] another from the place where the other person is found or restrain[ed] the liberty of the other person" for the purpose of "facilitat[ed] the commission of any felony." R.C. 2905.01(A)(2). "A person acts purposely when it is [his] specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is [his] specific intention to engage in conduct of that nature." R.C. 2901.22(A). Here, J.H. testified appellant restrained Flannery's liberty by pointing a gun at him and ordering him to move to the backyard. Carroll also testified appellant ordered Flannery to move to the backyard. Based on the testimony at trial, we find appellant's conviction for kidnapping was supported by sufficient evidence.

2. Aggravated Robbery

{¶ 44} Pursuant to R.C. 2911.01(A)(1), a person is guilty of aggravated robbery if the person "in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense [had] a deadly weapon on or about the offender's person or under the offender's control and either display[ed] the weapon, brandish[ed] it, indicate[d] that the offender possesse[d] it, or use[d] it." Pursuant to R.C. 2913.01(K)(1), "theft offense" includes a violation of R.C. 2913.02, namely theft. R.C. 2913.02 provides that a person is guilty of theft when the person "with purpose to deprive the owner of property or services, * * * knowingly obtain[ed] or exert[ed] control over either the property or services * * * [w]ithout the consent of the owner or person authorized to give consent." R.C. 2901.22(B) provides that "[a] person acts knowingly, regardless of

purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." "Deadly weapon" is defined in R.C. 2923.11 as "any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon."

{¶ 45} Here, J.H. testified appellant pointed a gun at Flannery and demanded Flannery step off the porch. Carroll testified he and appellant planned to rob a pizza delivery driver. According to Carroll, appellant told Flannery, "You know what time it is," which, according to Carroll, meant this was a robbery. (Tr. Vol. II at 370-71.) Carroll testified he took money from Flannery, while J.H. took the pizzas. Based on the testimony at trial, we find appellant's conviction for aggravated robbery was supported by sufficient evidence.

3. Aggravated Murder & Murder

{¶ 46} R.C. 2903.01 provides in pertinent part that a person is guilty of murder if that person "purposely cause[d] the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, kidnapping [or] aggravated robbery." Pursuant to R.C. 2903.02, a person is guilty of murder if the person "purposely cause[d] the death of another." J.H. testified he witnessed appellant shoot Flannery after holding him at gunpoint. Carroll testified appellant told him, "Watch out, Cuz. I'm about to shoot him." (Tr. Vol. II at 372.) Carroll moved out of the way and then heard a bang. This testimony, when considered in conjunction with the testimony relating to kidnapping and aggravated robbery, was sufficient to support appellant's conviction for aggravated murder and murder.

4. Having Weapons While Under Disability

{¶ 47} R.C. 2923.13 provides, in pertinent part, that unless relieved from disability, "no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if * * * [t]he person * * * has been convicted of any felony offense of violence or has been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been a felony offense of violence." R.C. 2923.13(A)(2). Here, appellant stipulated to his prior record for purposes of the charge of having weapons while under

disability.  Based on this stipulation combined with the evidence presented at trial, we find sufficient evidence supported appellant's conviction for having weapons while under disability.

{¶ 48} Therefore, having found the state presented sufficient evidence to support appellant's convictions, we overrule appellant's first assignment of error.

## IV.  Second Assignment of Error—Manifest Weight of the Evidence

{¶ 49} In his second assignment of error, appellant asserts his convictions for aggravated robbery, aggravated murder, and murder were against the manifest weight of the evidence.

{¶ 50} Whereas a challenge to the sufficiency of the evidence tests whether the evidence is adequate to sustain a verdict as a matter of law, a challenge to the manifest weight of the evidence relates to persuasion and tests whether the greater amount of credible evidence supports the verdict. *Eastley* at ¶ 11-13; *Thompkins* at 386-87. The Supreme Court of Ohio has stated:

> Weight of the evidence concerns "the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its *effect in inducing belief*."

(Emphasis sic.) *Eastley* at ¶ 12, quoting *Thompkins* at 387, quoting Black's Law Dictionary 1594 (6th Ed.1990).

{¶ 51} When reviewing a challenge to the manifest weight of the evidence, an appellate court cannot simply exchange its view for that of the trier of fact, but, instead, must " 'review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Williams*, 10th Dist. No. 16AP-540, 2017-Ohio-5598, ¶ 24, quoting *State v. McCrary*, 10th Dist. No. 10AP-881, 2011-Ohio-3161, ¶ 12, citing *Thompkins* at 387. This authority " 'should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins*

at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). In reviewing the evidence, "we are guided by the presumption that the jury, or the trial court in a bench trial, 'is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *State v. Cattledge*, 10th Dist. No. 10AP-105, 2010-Ohio-4953, ¶ 6, quoting *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). *See Eastley* at ¶ 21.

{¶ 52} In support of his assertion that his convictions were against the manifest weight of the evidence, appellant points to the fact that the testimony of J.H. and Carroll were different from what they initially told police. Appellant also argues the plea agreements of J.H. and Carroll render their testimony lacking in credibility. We find this argument to be without merit. The jury was aware of the plea agreements of J.H. and Carroll and was therefore in the best position to weigh that fact in determining their credibility. *State v. Jackson*, 10th Dist. No. 14AP-748, 2015-Ohio-5114, ¶ 24, citing *State v. Barber*, 10th Dist. No. 14AP-557, 2015-Ohio-2653, ¶ 21, citing *State v. Hudson*, 10th Dist. No. 06AP-335, 2007-Ohio-3227, ¶ 17. Furthermore, the trial court instructed the jury regarding J.H.'s and Carroll's credibility and the weight of their testimony in light of their related convictions.

{¶ 53} Appellant's attacks on the credibility of J.H. and Carroll fail for the additional reason that other evidence connects appellant to the incident in question. In her search of the basement at the Rotunda house where appellant was residing, Detective Swisher recovered pizza boxes with labels matching the information associated with the delivery to the vacant house. Sanchez testified that, after hearing a shot, he saw three individuals running from the delivery vehicle by the vacant house. Thus, the greater amount of credible evidence weighs in favor of appellant's convictions. *See State v. Edmond*, 10th Dist. No. 15AP-574, 2016-Ohio-1034, ¶ 34.

{¶ 54} Appellant also contends the alibi testimony renders his convictions against the manifest weight of the evidence. Based on the totality of the evidence, we find the state's evidence was stronger and more persuasive than appellant's alibi evidence. Latonya Nichols testified that she was very close with appellant and considered him "like my son." (Tr. Vol. III at 588.) Brian Nichols testified appellant was "very close" and "like a cousin or a brother" to him and his other siblings. (Tr. Vol. III at 635.) The jurors were entitled to

believe the state's evidence that appellant was present at the incident in question and was responsible for shooting Flannery. *See State v. Taylor*, 10th Dist. No. 17AP-103, 2017-Ohio-8327, ¶ 37, quoting *State v. Raver*, 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶ 21, citing *State v. Antill*, 176 Ohio St. 61, 67 (1964) (stating that "the jury may take note of the inconsistencies and resolve them accordingly, 'believ[ing] all, part, or none of a witness's testimony' "). As a result, we find there was a sufficient basis for the jury to disbelieve appellant's alibi. *See State v. Elson*, 10th Dist. No. 13AP-554, 2014-Ohio-2498, ¶ 27; *State v. Nickell*, 10th Dist. No. 13AP-336, 2013-Ohio-5144, ¶ 25-28.

{¶ 55} Therefore, having reviewed the entire record, weighing the evidence and all reasonable inferences, and considering the credibility of the witnesses, we cannot find that the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Accordingly, we overrule appellant's second assignment of error.

## V. Third Assignment of Error—Closing Argument

{¶ 56} In his third assignment of error, appellant asserts the trial court erred by allowing the state in closing arguments to argue the timing of appellant's notice of alibi.

{¶ 57} Crim.R. 12.1 provides:

> Whenever a defendant in a criminal case proposes to offer testimony to establish an alibi on his behalf, he shall, not less than seven days before trial, file and serve upon the prosecuting attorney a notice in writing of his intention to claim alibi. The notice shall include specific information as to the place at which the defendant claims to have been at the time of the alleged offense. If the defendant fails to file such written notice, the court may exclude evidence offered by the defendant for the purpose of proving such alibi, unless the court determines that in the interest of justice such evidence should be admitted.

"[W]here a defendant has filed a timely notice of alibi, and has given testimony tending to prove the alibi, it is error for the court to permit the prosecutor to adduce evidence of the date that defendant filed the notice of alibi." *State v. Sims*, 3 Ohio App.3d 331 (8th Dist.1982), paragraph one of the syllabus. "The prosecuting attorney may not adduce evidence of the date that the defendant filed the notice of alibi because the failure to file it promptly is not probative of guilt and because it is tantamount to adducing evidence about

the defendant's silence." *State v. Hirsch*, 129 Ohio App.3d 294, 311 (1st Dist.1998), citing *State v. Tolbert*, 70 Ohio App.3d 372, 380-81 (1st Dist.1990).

{¶ 58} When reviewing allegations of prosecutorial misconduct, the test for appellate courts is whether the prosecutor's conduct was improper, and if so, whether that conduct prejudicially affected the substantial rights of the accused. *State v. Pilgrim*, 184 Ohio App.3d 675, 2009-Ohio-5357, ¶ 57 (10th Dist.) "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." (Internal quotations and citations omitted.)   *State v. Wilkerson*, 10th Dist. No. 01AP-1127, 2002-Ohio-5416, ¶ 38, quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982). "Accordingly, prosecutorial misconduct will not be grounds for reversal unless the defendant has been denied a fair trial."  *Elson* at ¶ 30, citing *State v. Maurer*, 15 Ohio St.3d 239, 266 (1984).

{¶ 59} "A prosecutor is afforded wide latitude in closing argument, which must be reviewed in its entirety in order to determine whether the challenged remarks prejudiced the defendant." *Id.* at ¶ 43, citing *State v. Hill*, 75 Ohio St.3d 195, 204 (1996).  During closing argument, the state can summarize the evidence and draw conclusions as to what the evidence shows. *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, ¶ 116.

{¶ 60} Here, appellant did not object to the state's arguments related to the timing of the notice of alibi. Instead, appellant's counsel raised arguments related to the timing of discovery and the number of continuances in the case. Most importantly, appellant's counsel stated that arguments made by the state related to the timing of the notice of alibi were proper:

> [Assistant Prosecutor]: So then the jury's left with the notion that this is the trial date, the one and only; and they come forward with their alibi before this one and only trial date. That is not the analysis that is factually correct here.
>
> They were scheduled for trial eight times and didn't say one word about alibi. And they didn't say a word about it until after this defendant finds out that his co-defendant, Sir Jeffrey Carroll, is going to testify against him. And then all of a sudden there's an alibi.
>
> [Appellant's Counsel]: I don't know what that has to do with providing late discovery and telling the jury there's one trial date, two trial dates, three trial dates. The bottom line is is [sic] we provided that information. The jury has the information.

*They can make the inference and argue that they got last-minute notice.* We don't need to get into specifics about trial dates and continuances.

[The Court]: I think they want to argue that, you know, that this case was going to trial eight different times and here's two key witnesses that didn't bother to come forward.

[Appellant's Counsel]: Then I should be able to argue I didn't get the discovery at the last minute, and we were never really prepared to go to trial, and we would have been in trouble had we realized that we didn't have the discovery that we needed to go to trial.

[The Court]: I don't see what that discovery would have had to do with these two witnesses.

[Appellant's Counsel]: Strategically I may not have disclosed the two witnesses if I knew -- you know, we haven't made that decision ultimately. And I have not sat down with my client to the final point of preparing our defense, his testimony, and totally evaluating the case. So for strategic reasons --

*Obviously they should be able to point it out. I'm not saying they can't get up and say I didn't file my notice of alibi on the 27th. I'm not disputing that.* What I'm disputing is them articulating there were multiple continuances because there were -- what's it matter if there's one continuance or four continuances.

(Emphasis added.) (Tr. Vol. IV at 755-56.)

{¶ 61} Thus, any error resulting from the state's argument was invited by the concession of appellant's trial counsel. " 'Under the "invited error" doctrine, a party may not take advantage of an error which he invited or induced.' " *State v. Neil*, 10th Dist. No. 14AP-981, 2016-Ohio-4762, ¶ 75, quoting *State v. Griffin*, 10th Dist. No. 10AP-902, 2011-Ohio-4250, ¶ 16. " 'Pursuant to this doctrine, a party cannot claim that a trial court erred by accepting the party's own stipulation.' " *Id.*, quoting *State v. McClendon*, 10th Dist. No. 11AP-354, 2011-Ohio-6235, ¶ 37.

{¶ 62} Moreover, even if appellant's trial counsel did not invite the alleged error, appellant's failure to object forfeited review of any such error absent plain error. *Id.* at ¶ 76. " 'Plain error consists of an obvious error or defect in the trial proceedings that affects a substantial right.' " *Williams*, 2017-Ohio-5598, at ¶ 28, quoting *State v. Lindsey*, 87 Ohio St.3d 479, 482 (2000). Pursuant to Crim.R. 52(B), "[p]lain errors or defects affecting

substantial rights may be noticed although they were not brought to the attention of the court." An appellate court takes notice of plain error " 'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.' " *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002), quoting *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

{¶ 63} Appellant argues that pursuant to *Hirsch*, it was error to permit the state to include in its closing argument references to the date appellant filed his notice of alibi. In *Hirsch*, the defendant timely filed his notice of alibi. The court found that it was "patently improper" for the state to have "adduced evidence and argued about the date that Hirsch filed his notice of alibi." *Hirsch* at 311. Nevertheless, because Hirsch failed to object and the court could not conclude that the error was so egregious as to deprive Hirsch of a fair trial, the court found Hirsch failed to demonstrate plain error.

{¶ 64} Here, unlike in *Hirsch*, there is no dispute that appellant failed to file a timely notice of alibi pursuant to Crim.R. 12.1. Therefore, we find that *Hirsch* is not dispositive of the issue before us. However, even if we were to find the trial court erred in permitting the state to argue the timing of the notice of alibi, we would find such error to be harmless considering the overwhelming evidence supporting appellant's convictions. *See Ohio v. Depew*, 38 Ohio St.3d 275, 288 (1988); *State v. Banks*, 10th Dist. No. 03AP-1286, 2005-Ohio-1943, ¶ 6; *Elson* at ¶ 43. As appellant has failed to demonstrate prejudice, we cannot find the trial court committed plain error by allowing the state to include references to appellant's untimely filing of his notice of alibi during closing arguments. *Hirsch* at 311; *Tolbert* at 381. Accordingly, we overrule appellant's third assignment of error.

## VI. Conclusion

{¶ 65} Having overruled appellant's three assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

BROWN, P.J., and LUPER SCHUSTER, J., concur.

———————